In re Antonio GALINDO, Debtor.

Jarred L. Whited, Plaintiff,

v.

Antonio Galindo, Defendant.

Bankruptcy No. 10–12794–MM7.
Adversary No. 10–90473–MM.

United States Bankruptcy Court,
S.D. California.

Feb. 1, 2012.

204

made" in how the transaction was handled with Whited, Galindo claimed he lacked the fraudulent, willful or malicious intent necessary to except Whited's debt from discharge. Having considered Whited's and Galindo's properly admitted evidence and testimony at the trial held on January 3 and 4, 2011, the Court disagrees. Based in part upon Galindo's proclivity to subvert the law to turn a profit, the Court finds that Galindo intended to defraud Whited by concealing the car's previous rental history when he sold it to Whited, and by assuring Whited that his car was financed by a finance company when it had not been. The Court also finds that Galindo willfully and maliciously repossessed Whited's car when Whited was current with his monthly payments.

For the reasons set forth below, the Court grants Whited judgment on his complaint as set forth in this Memorandum Decision.

## I. FACTUAL BACKGROUND

On December 3, 2009, Whited, a twenty-year-old Navy sailor, and his new eighteen-year-old wife visited Galindo's used car dealership Southbay Preowned, the dba of Galindo's solely owned corporation National KARS, Inc. ("Southbay"). The Whiteds were directed to Southbay after Jarred Whited's credit was rejected at another used car dealership. Whited's credit was poor since he had suffered two previous repossessions; one was when he was 17 and another when he was 18. The Whiteds became interested in a 2006 Hyundai Sonata ("Sonata") they saw on the lot. The Southbay salesman they were dealing with, Marco Duarte, told them that

David L. Speckman, San Diego, CA, for Debtor and Defendant.

Ellen E. Turnage, McCoy, Turnage & Robertson, LLP, San Diego, CA, for Plaintiff.

## MEMORANDUM DECISION RE TRIAL TO DETERMINE DIS-CHARGEABILITY OF DEBT

MARGARET M. MANN, Bankruptcy Judge.

Jarred L. Whited ("Whited") sued used car dealer Antonio Galindo ("Galindo") for non-dischargeability, alleging claims under 11 U.S.C. §§ 523(a)(2)(A) and (6).[1] Although acknowledging that "mistakes were

---

1. Whited initially alleged, but then abandoned, his 11 U.S.C. § 727(a)(2)(A) and (B) claims by the time of trial, which were not viable in any event. The complaint alleged fraudulent conveyances by Galindo of Whited's cars he acquired in the year prior to the petition date. However, after repossession, these cars were owned by Southbay, and were not Galindo's property to fraudulently convey.

the Sonata had been owned by his friend who had kept all of the maintenance records. This was not true. The Sonata had been owned by a rental agency, as Galindo knew, because he was responsible for purchasing the inventory for Southbay.

To finalize the sale, Whited was introduced to Galindo at the dealership's sales office. Galindo identified himself as the owner and president of Southbay. He was also the individual holder of the California Department of Motor Vehicles ("DMV") license for Southbay, and thus legally responsible for the dealership's compliance with the law. Whited offered his wife's Ford Focus ("Focus") as a trade-in on the sale, but Galindo told Whited the sale would be easier to finance if he could make a cash down payment. This statement was also not true. Galindo insisted on reporting a cash down payment to avoid paying a fee to the finance company, not to make the sale easier to finance. Since Whited did not have cash, and needed to finance the Sonata, Galindo suggested Mrs. Whited transfer her Focus to Southbay for a $1,500 credit on the sale instead.[2] Southbay documented the transaction with the DMV, not as a sale by Mrs. Whited to the dealership, but as an un-described transfer.

Whited and Galindo negotiated a price of $10,999 for the Hyundai, eventually arriving at a final price of over $13,600 including taxes, fees, add-ons, and repair contracts. After the $1,500 credit, Whited financed the balance under a Retail Installment Sales Contract ("Contract") that listed Southbay as the secured creditor and seller of the Sonata. As clearly stated in the Contract, Southbay had 10 days after the sale to sell the Contract to a financing company, or Southbay would no longer have the right to rescind the sale, and would have to carry the financing itself. Galindo intended to immediately sell the Contract to Security National Automotive Acceptance Corporation ("SNAAC"), and received immediate preliminary credit approval for Whited from SNAAC. Galindo told Whited SNAAC had agreed to finance Whited's purchase of the vehicle, and assisted him in setting up an allotment from Whited's military pay— an automatic debit from Whited's bank account—to facilitate Whited's monthly payments to SNAAC. Despite Galindo's confirmation that SNAAC had financed the Sonata, SNAAC had not at that time, or at any later time, bought the Contract to provide the financing for the Sonata.

During December, the Sonata developed electrical problems and began to suffer from a bulging tire, which did not deter Whited from wanting to keep it. Whited and Galindo cooperated with providing SNAAC additional information to assist it in evaluating whether to buy the Contract. On December 31, 2009, SNAAC received its first payment on the Contract from the military allotment arranged by Galindo from Whited, although the first payment was not due until January 17, 2010.

· In early January, SNAAC called Whited with a paperwork problem and told Whited it had not yet decided to buy the Contract from Southbay. Alarmed that he had been lied to by Galindo about the financ-

---

**2.** Mrs. Whited was not a party to the suit despite providing the Focus, so the Court does not evaluate any claims she might have against Galindo. Because the Focus was her separate property acquired before marriage, Mrs. Whited is the only person who had the right to sue for the Focus' fair market value, as Evidence Code § 662 provides that "The owner of the legal title to property is presumed to be the owner of the full beneficial title." *In re Marriage of Weaver*, 224 Cal. App.3d 478, 485, 273 Cal.Rptr. 696 (Cal. App.2d Dist.1990). Family Code § 752 reads "Except as otherwise provided by statute, neither husband nor wife has any interest in the separate property of the other."

ing, Whited returned to Southbay wanting to unwind the sale and retrieve the Focus if he had no financing. Galindo assured Whited that the financing was approved and asked him to return on January 11th, a Monday, so they all could speak with SNAAC. Whited did so, along with his wife. After a group call with SNAAC during which nothing was resolved, Galindo separately spoke to SNAAC. After that call, he reassured Whited that financing "was approved" and even congratulated the young couple on their "new" car.

The Whiteds were somewhat reassured by Galindo's comments until two days later, when SNAAC called Whited to conduct a loan interview. Whited agreed to the interview, confirmed that the car drove well and that he liked it, and answered the SNAAC representative's questions. Whited shared with SNAAC that Galindo had told him that SNAAC had already purchased the Contract. SNAAC responded that Galindo "should not have said that," because the Contract had not been purchased.

Mrs. Whited initially, and then together with her husband, returned to Southbay that same day to clarify whether their car was financed. They alternatively sought to rescind the sale of the Sonata, get a refund of the payment they had made to SNAAC, and get their Focus back. Galindo refused to rescind the deal or to refund the payment even though he acknowledged the SNAAC deal was dead. He blamed Whited for "sabotaging" the SNAAC financing, leaving Southbay obligated to hold the Contract. Because Galindo refused to rescind the deal, Whited told Galindo he was going to stop the allotment to SNAAC for the February payment, and later asked how he should make the Feb-

ruary payment under the Contract. Galindo insisted Whited make a second January payment by cash or check before the first contractual due date of January 17. Whited was unwilling to make a second January payment, but offered to set up another allotment from his military pay for Southbay's benefit for the February payment. Whited also asked for a payment plan or invoice to reflect the status of the payments Whited had already made on the Contract. Galindo refused both requests and warned Whited that Southbay would repossess the Hyundai at the end of the month if Whited did not make a second January payment.

That day Whited reported Galindo to the Better Business Bureau ("BBB"). Galindo responded to the BBB acknowledging that Whited had made the January payment.[3] Galindo asserted and Whited denied that Whited requested a refund from SNAAC at that time. After the BBB took no action, the Whiteds sought legal assistance. In the meantime, Galindo directed a tow company to repossess the Sonata on January 31, 2010. Whited's counsel wrote Galindo on February 2, 2010, claiming the sale violated myriad provisions of California law and demanding Galindo rescind the deal and return Mrs. Whited's Focus.

Despite Galindo's receipt of the letter advising him of his violations of the law, Southbay sold the Sonata to itself at a private foreclosure sale on February 19, 2010. Southbay filed no DMV records for the Whited sale, and Southbay resold the Sonata on March 19, 2010 without a warranty contract for $148.29 more than it was sold to Whited. At this time, the Sonata's odometer was recorded at the

---

3. Months later Whited secured a refund of the January payment from SNAAC, and it is no longer a part of his claim for damages.

exact same mileage it had when it was sold to Whited, despite his having driven it for nearly two months, including driving to visit family in Central California during the holidays. Southbay failed and closed in May of 2010. At the end of May, Southbay sold the Focus to a related dealership owned by Galindo, which then resold it to a customer for $5,495.

When Galindo did not respond to Whited's counsel's letter, Whited sued Southbay and Galindo in state court. As the personal guarantor on a commercial lease and commercial line of credit for the dealership, Galindo's personal financial situation was tied to the dealership's woes. He filed Chapter 7 bankruptcy two months after Southbay closed.

Whited timely filed his non-dischargeability complaint on September 28, 2010.

## II. *JURISDICTION*

Whether this Court has constitutional authority to enter findings of fact and conclusions of law in this adversary proceeding based upon *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 2601–02, 180 L.Ed.2d 475 (2011), has not been raised by the parties. *See Musich v. Graham (In re Graham),* 455 B.R. 227, 232 (Bankr. D.Colo.2011). The Court believes it has such authority on a number of bases. Under 28 U.S.C. § 157(b)(1), bankruptcy judges may hear and enter final judgments in core proceedings "arising under" or "arising in" Title 11. This case on debt dischargeability is "core" to the Bankruptcy Code. 28 U.S.C. § 157(b)(2)(L)(discharge issues are statutorily core); *Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(bankruptcy courts have exclusive jurisdiction over discharge matters). In the Ninth Circuit, "the Bankruptcy Court has jurisdiction to enter a monetary judgment on a disputed state law claim in the course of making a

determination that a debt is dischargeable." *Sasson v. Sokoloff (In re Sasson),* 424 F.3d 864, 867–868 (9th Cir.2005); *see also Cowen v. Kennedy (In re Kennedy),* 108 F.3d 1015, 1018 (9th Cir.1997). To corroborate the Court's authority to enter final judgment quantifying Whited's debt as well as to determine its dischargeable nature, are the admissions made by Whited and Galindo in their pleadings that this Court had jurisdiction to decide the matter as referred from the District Court. *See, e.g., Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848–49, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (recognizing that parties can agree to be bound by a decision of a court that may lack specific constitutional authority to make a final decision without their consent).

Nevertheless, the Court is aware of an issue that bankruptcy courts lack constitutional authority to quantify a non-dischargeable debt, despite their recognized authority to determine the debtor's ability to discharge that debt. *See Ohio Bureau of Workers' Comp. v. Damron (In re Damron),* 457 B.R. 662, 667 n. 4 (Bankr. S.D.Ohio 2011) (noting that Stern calls into question whether a bankruptcy judge may enter a final money judgment in a nondischargeability action). If the District Court determines this case to be only "related to" Title 11, to the extent that this Court lacks authority to enter a final judgment, this Memorandum Decision may serve as the Court's recommended findings of fact and conclusions of law for the District Court to review de novo.

## III. *ANALYSIS*

The statutory exceptions to discharge generally are to be construed strictly in favor of the debtor and against those seeking to except debts from the discharge. *See, e.g., Snoke v. Riso (In re*

*Riso)*, 978 F.2d 1151, 1154 (9th Cir.1992). However, the right to a discharge is denied to a dishonest debtor, such as Galindo. *Grogan v. Garner*, 498 U.S. at 287, 111 S.Ct. 654 ("The [Bankruptcy Code] limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate' debtor."). The creditor bears the burden of proof to establish each element by a preponderance of the evidence. *Id.* at 291, 111 S.Ct. 654.

### A. First Cause of Action—Violation of 11 U.S.C. § 523(a)(2)(A)

■ Bankruptcy Code section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud." The Ninth Circuit employs a five-part test for determining when a debt is non-dischargeable under § 523(a)(2)(A). Whited must show that: (1) Galindo made the representations; (2) Galindo knew they were false; (3) Galindo made them with the intention and purpose of deceiving Whited; (4) Whited relied on the statements; and (5) Whited sustained damages as the proximate result of the representations. *In re Britton*, 950 F.2d 602, 604 (9th Cir.1991) (applying elements to deny debt discharge in Chapter 7 bankruptcy where debtor fraudulently convinced creditor to submit to surgery).

Whited contends Galindo defrauded him by failing to disclose the ownership history and the mechanical problems with the Sonata, and by making affirmative misrepresentations in connection with Whited's trade-in of the Focus and whether SNAAC had financed the Sonata by buying the sales contract. The Court finds Whited met his burden of proof on fraud under § 523(a)(2)(A) on some, but not all of these claims.

### 1. Failure to Disclose the Ownership History and Mechanical Problems

■ Whited claims he experienced electrical and tire problems with the Sonata within a week after driving off of the lot, although he did not notice these problems during the test drive, and no one at Southbay made any statements regarding the mechanical condition of the vehicle. Whited did not prove fraud in connection with the mechanical problems. He did not offer evidence that these problems were discussed with him or that the problems were in existence at the time of the sale, much less that Galindo, or that anyone at Southbay, knew about the problems before they arose. There is no evidence of a knowingly false representation to Whited, and two of the five necessary elements of fraud are absent. *See In re Britton*, 950 F.2d at 604 (listing each element necessary to prove fraud). While the timing of the appearance of these mechanical problems is suspicious, and may give rise to state court remedies against non-debtor parties, the Court cannot find non-dischargeable fraud on this record.

■ But Whited did prove fraud in regard to the false statements regarding the ownership history made by salesman Marco Duarte. That Galindo did not personally make the statements regarding the rental history of the Sonata does not foreclose a finding of fraud against him. *See McIntyre v. Kavanaugh*, 242 U.S. 138, 139, 37 S.Ct. 38, 61 L.Ed. 205 (1916) (holding a corporate tort nondischargeable by individual partner because tortious act was within scope of firm's business). Nondisclosure of information that Galindo has a duty to disclose may also constitute a false representation under § 523(a)(2)(A). Galindo, as the holder of the DMV license and owner of Southbay, had a specific statutory duty under California law to accurately disclose the rental history of the Sonata.

Section 260.02 [4] of the California Code of Regulations requires sellers of former taxicabs, rental, salvage, and publicly owned vehicles to identify those vehicles as such if they know the vehicles' status. 13 C.C.R. § 260.02. California Civil Code §§ 1770(a)(2) and (5) also prohibit the misrepresentation of the source, sponsorship, approval, or certification of goods or services. Civil Code § 1770(a)(16) bars representing "that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Galindo's deceptive omission therefore violates state law, rendering his debt nondischargeable. *See Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1323–24 (9th Cir.1996) (holding debt nondischargeable for material omission contrary to state law and the Restatement of Torts).

As the holder of the DMV license, Galindo knowingly bore the duty to disclose the ownership history of the cars he sold. He regularly checked vehicles' prior ownership via the Carfax service upon Southbay's acquiring them. He also was the person who purchased the Sonata at auction. While Galindo denies knowing about the prior rental status of the Sonata when he sold it to Whited, the Court does not believe him [5] under these facts. Even if the Sonata auction purchase was Galindo's unusual exception to checking the title before purchasing a car at auction, his ignorance would be manifestly unreasonable given his legal obligations. He had a duty to disclose the car's rental status, a basic, material fact of the sale that Whited could not discover without a Carfax subscription of his own. *See id.* at 1324 ("[A] party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover."). Duarte's knowing misrepresentation and Galindo's concealment combined to form fraud by giving Whited a false impression. *See Loomas v. Evans (In re Evans)*, 181 B.R. 508, 515 (Bankr. S.D.Cal.1995) (holding debtor's false representations and material omissions regarding sale of a vacant lot as nondischargeable fraud).

While the evidence of actual reliance by Whited on the rental history of the car is scant, if not absent, "(r)eliance is not a factor since it is not possible to rely on facts which have been concealed." *In re Evans*, 181 B.R. at 515. Justifiable reliance similarly need not be further proven when a party with a duty to disclose a material fact fails to do so. *See*

---

**4.** California Code of Regulations § 260.02(b) states:

> (b) Former taxicabs, rental vehicles, publicly owned vehicles, insurance salvage vehicles and revived salvage vehicles shall be clearly identified as such if the previous status is known to the seller.

**5.** In applying the evidence to the elements of Whited's claims, the Court discounts much of Galindo's testimony since it was not credible. Galindo, an experienced, sophisticated used car dealer, repeatedly skirted, if not outright violated, the law to his personal financial advantage; the odometer problem and the salesman's misrepresentations were just two of the examples before the Court. Frequently evasive and forgetful during his testimony in

Court, Galindo denied knowing that Whited was current in his payments to SNAAC when he repossessed the Sonata, despite his contemporaneous email to the Better Business Bureau that confirmed this knowledge. Galindo also sought to deceive SNAAC out of a fee by treating the trade-in as a cash purchase—further evidence of his shady business practices.

On another critical issue, Galindo again changed his story about whether he offered to return the Focus to the Whiteds. At trial, he testified he had no obligation to do so. In his trial brief, Galindo blamed the Whiteds' loss of the Focus on their lack of efforts to reclaim it after January, even though they had written a letter in February demanding the car's return, which he ignored.

*Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 68 (9th Cir. BAP 1998) (excepting individual lawyer's debt from discharge based on fraudulent nondisclosure). Whited's reliance was also established by law in light of his youth and lack of knowledge, in comparison to Galindo's status as a seasoned expert. *See Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1458 (9th Cir.1992) (stating that the standard for justifiable reliance "is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves.").

The comprehensive state law protecting consumers from shady used car dealers also helps Whited satisfy the element of proximate cause. Galindo's concealment of the title history, in violation of 13 C.C.R. § 260.02, resulted in Whited trading in his Focus, causing him harm because of Galindo's false pretenses.

Since each of the elements of fraud is met as to the history of the Sonata, Whited has proven this claim.

### 2. Affirmative Misrepresentations Regarding Trade-in and Financing

 In addition to his concealment claims, Whited has two claims of direct misrepresentation by Galindo. He first contends Galindo committed fraud by listing the Focus as a sale by Mrs. Whited to Southbay and then showing the trade-in value of the Focus as a cash down payment for Whited's purchase of the Sonata. This unnecessarily complicated treatment of the down payment credit to the Contract was inaccurate. No cash was exchanged in what was functionally a trade-in. The way Galindo insisted the deal be structured was meant to benefit Galindo personally. Galindo testified he characterized the Focus as a trade-in to avoid a fee from SNAAC.

Despite this evidence, the Court does not find fraud on the trade-in claim. First, Galindo's intent to deceive was directed not at Whited, but potentially at SNAAC. This does not prove fraud for Whited because the cause of action requires intent to deceive the plaintiff. *See In re Eashai*, 87 F.3d 1082, 1090 (9th Cir.1996).

Second, false statements do not prove fraud unless they are "substantially inaccurate" and are of the type that "would affect the creditor's decision making process." *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996). Galindo's manner of handling the Focus as a trade-in did not seem to make any difference to Whited's rights. It did not affect Whited's rescission rights. California Civil Code § 2982.7(b)[6] provided Whited upon breach of the contract either a right to return of the Focus or its value, which would be the trade-in amount. For this reason, the Court does not find Whited proved fraud on the trade-in claim.

 The Court finds Whited did successfully prove his case of fraud by Galindo's multiple false assurances that SNAAC had bought the Contract, however. These assurances were knowingly false. All SNAAC ever did was provide initial credit approval; it never funded the deal. Galin-

---

6. California Civil Code § 2982.7(b) provides: (b) In the event of breach by the seller of a conditional sale contract or purchase order where the buyer leaves his motor vehicle with the seller as downpayment and such motor vehicle is not returned by the seller to the buyer for whatever reason, the buyer may recover from the seller *either the fair market value of the motor vehicle left as a downpayment or its value as stated in the contract or purchase order, whichever is greater.* The recovery shall be tendered to the buyer within 5 business days after the breach. (Emphasis added.)

do knew SNAAC had not bought the Contract since he had dealt with SNAAC numerous times and his contract with SNAAC said the Contract was not bought until the financing was funded. Under California Vehicle Code § 11713, Galindo was responsible for explaining the financing accurately and completely. *See Ford Dealers Assn. v. Dep't of Motor Vehicles,* 32 Cal.3d 347, 357, 185 Cal.Rptr. 453, 650 P.2d 328 (1982) (explaining that under the California Vehicle Code, the scope of actionable representations by a car dealer to a consumer is extremely broad, including oral statements).

The Court also finds Galindo made the financing misrepresentations with intent to deceive, the most important element of a § 523(a)(2)(A) inquiry. *See In re Eashai,* 87 F.3d at 1090. There is a wealth of circumstantial evidence of Galindo's intent to sell cars only if he could also arrange third-party financing, regardless of whether these efforts deceived his customers including Whited. To encourage a sale of the Sonata, and then receive cash from SNAAC from the purchase of the Contract, Galindo advised at the outset that the financing was approved and set up a payment plan for Whited with SNAAC. This left Whited vulnerable to a default when the SNAAC deal fell through. Galindo then continued to make false promises of financing to discourage Whited from exercising his legal rights to rescind the deal. Galindo refused to provide Whited with invoicing or documentation of the status of the financing with Southbay. Galindo reacted sharply when he learned the SNAAC deal was dead, accusing Whited of sabotage. Being unable to cash out the sale to Whited with financing from SNAAC, Galindo asserted a pre-textual default which enabled him to resell both cars at a profit. By asserting this false claim of default, Galindo managed to avoid his acknowledged obligation to hold the financing since Southbay's rescission right expired on December 13, 2009.

That Galindo's actions took place a few months before Southbay failed and closed supports this finding of Galindo's intent to deceive. As the guarantor of Southbay's financing, with his personal financial status directly related to the dealership, Galindo advanced his personal interests by the resale of both vehicles. In fact, Galindo's bankruptcy was caused by Southbay's financial woes when it failed a few months later.

All of these circumstances show Galindo's misstatements of the status of the financing and other non-disclosures were not innocent, but motivated by self-interest. This evidence establishes Galindo's intent to deceive. *See Alexander & Alexander of Washington, Inc. v. Hultquist (In re Hultquist),* 101 B.R. 180, 183–84 (9th Cir. BAP 1989) (intent to deceive could be inferred from the totality of the circumstances where debtor sales agent took sale commission even though third party insurance company had only preliminarily approved creditor).

■■■■■■ Galindo's misrepresentations also induced Whited to rely to his detriment. The reasonableness of Whited's reliance is evaluated under a subjective standard. *See Field v. Mans,* 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Tallant,* 218 B.R. at 67 (justifiable reliance standard considers circumstances and relationship between parties, lowering standard where parties are friends). Galindo was far more sophisticated about dealership financing, and Whited justifiably relied upon him. *See In re Kirsh,* 973 F.2d at 1458–59 (reasonable reliance is determined by a subjective standard, taking into account the parties' characteristics). Galindo took advantage of Whited, who was deeply concerned about obtaining financ-

ing before he traded in his wife's Focus. Galindo was aware both that Whited had had two repossessions while still a teenager, and that he had already been turned down for financing by one dealer before visiting Southbay. Most importantly, the first two times Whited received information casting doubt on whether SNAAC had actually bought the Contract, Galindo intervened to falsely reassure Whited. These reassurances justified Whited's reliance in making the payment. *See In re Eashai*, 87 F.3d at 1091 (debtor's minimum monthly payments justified creditor's reliance in extending credit).

Next to be considered is the proximate cause element. *In re Britton*, 950 F.2d at 604. Galindo argued Whited is the one to blame for the loss of both his new car and his old one because Galindo did not know about Whited's January payment to SNAAC. Not only Whited's credible testimony, but also Galindo's contemporaneous email to the BBB, proves Galindo's feigned ignorance to be false. Galindo also claims he was entitled to demand a second January payment since Whited could have claimed, and eventually did claim, a refund from SNAAC. Galindo provides no authority justifying his right to a second payment, neither under the Contract or the law. The Automobile Sales Finance Act ("ASFA") puts the burden on the dealer, not the customer, to assure the lack of a default before a repossession can occur in any event. California Civil Code § 2983.3 prohibits repossession of a motor vehicle in the absence of a buyer's default.[7]

Due to Galindo's fraud, Galindo should have foreseen that Whited would insist upon his legal rights to unwind the transaction, or at least to respect the transaction as Galindo had set it up. *See In re Britton*, 950 F.2d at 605 (finding proximate cause elements satisfied when creditor responds in a foreseeable manner to fraudulent acts). In disrespect of both of these legally valid courses of action, Galindo instead pursued a third—one proscribed by law but the one most advantageous to Galindo's financial interests. Even when Whited's counsel pointed out all of Galindo's legal transgressions in a letter that demanded the deal be unwound under California Civil Code § 2984,[8] Galindo proceeded to foreclose on Southbay's lien on the Sonata, and sold both cars at higher prices than what was reflected in his deal with Whited. Proximately caused damages may thus be found.

**B.** *Second Cause of Action—Violation of 11 U.S.C. § 523(a)(6)*

Section 523(a)(6) of the Bankruptcy Code renders a debt arising from a "willful and malicious injury by the debtor to another entity or to the property of another entity" non-dischargeable. The Court finds that Galindo injured Whited in the tortious, willful and malicious manner required under § 523(a)(6) by repossessing and selling the Sonata when Whited was current under the Contract, and then failing to return Whited's $1,500 deposit from the trade-in of the Focus.

---

7. California Civil Code § 2983.3 states:
 In the absence of default in the performance of any of the buyer's obligations under the contract, the seller or holder *may not* accelerate the maturity of any part or all of the amount due thereunder or *repossess the motor vehicle.* (Emphasis added)

8. The relevant part of California Civil Code § 2984 provides:

 "If notified in writing by the buyer of such a failure to comply with any provision of this chapter, the correction shall be made within 10 days of notice. Where any provision of a conditional sale contract fails to comply with any provision of this chapter, the correction shall be made by mailing or delivering a corrected copy of the contract to the buyer."

■ Galindo's knowingly unjustified repossession of the Sonata is the type of tortious breach of contract recognized by the Ninth Circuit to be non-dischargeable under § 523(a)(6). An intentional breach of a contract alone will not trigger the "willful and malicious injury" dischargeability exception. *See Lockerby v. Sierra,* 535 F.3d 1038, 1043 (9th Cir.2008) (debt arising from an unjustified breach of a settlement agreement without separate tortious conduct is dischargeable). However, Galindo's breach of contract was accompanied by tortious or unlawful conduct that resulted in willful and malicious injury. In these circumstances, the resulting debt is excepted from discharge. *See Banks v. Gill Distrib. Ctrs., Inc. (In re Banks),* 263 F.3d 862, 869 (9th Cir.2001) (taking a knowingly unjustified position in a contract dispute to cause the other party to accept less than it was due was a willful and malicious injury); *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1209 (9th Cir.2001)(failure of a corporate officer to pay employees when funds were available created a non-dischargeable debt when the action was a California misdemeanor, and the state court had awarded punitive damages).

Galindo's conduct also constituted a willful and malicious conversion of the Sonata that may be non-dischargeable under § 523(a)(6). *See McIntyre v. Kavanaugh,* 242 U.S. 138, 139, 37 S.Ct. 38, 61 L.Ed. 205 (1916) (holding a corporate conversion non-dischargeable in bankruptcy by an individual partner because unjustified act created injury and was within scope of firm's business).[9] *See Leonard v. Guillory (In re Guillory),* 285 B.R. 307, 316 (Bankr. C.D.Cal.2002) (finding an unjustified car repossession willful and malicious).

Addressing each of the willful and malicious prongs separately, Galindo's conversion of the Sonata is willful due to his subjective awareness that his intentional actions would cause injury. Whited proved the first "willful" prong of the test since Galindo's repossession and resale of the Sonata was calculated and purposeful as in *Banks,* 263 F.3d at 869, rather than reckless. *Cf. Carrillo v. Su (In re Su),* 290 F.3d 1140, 1145–46 (9th Cir.2002) (reckless injury from car accident was dischargeable); *Thiara v. Spycher Bros. (In re Thiara),* 285 B.R. 420, 434 (9th Cir. BAP 2002) (conversion case remanded due to lack of findings on either subjective intent to injure or knowledge that injury would result). Galindo arranged the repossession knowing that injury would result to Whited and his wife, one of whom would be without transportation, which they could not easily replace due to their youth and previous financing problems. This breach was not only tortious, but also unlawful under the provisions of California Civil Code § 2983.3 and contrary to California's fundamental policy of protecting consumers from unethical used car dealers.[10] *Jercich,* 238 F.3d at 1204.

■ Whited also proved the second "malicious" prong to the § 523(a)(6) test. This prong involves: "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich,* 238 F.3d at

**9.** The Supreme Court in *Geiger* cited *McIntyre* as consistent with its clarification of the definition of willful and malicious. *Kawaauhau v. Geiger,* 523 U.S. 57, 63–64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

**10.** The Consumers Legal Remedies Act, California Civil Code § 1770 et seq., is "to be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to ensure such protection."

1209. While many of the willful and malicious elements overlap, the key differentiating factor between the "willful" and "malicious" tests is whether Galindo acted without just cause or excuse. *See id.* Similar to the facts of *Banks,* 263 F.3d 862, and *Jercich,* 238 F.3d 1202, Galindo deliberately breached the Contract without justification or excuse when he repossessed the Sonata while Whited was current on his payments. He knew that Whited had already made the first payment under the plan to SNAAC—in fact, Whited had done so with Galindo's assistance and at his direction. But Galindo ignored that payment, either to ensure he received a second payment for the same month, or to set up a pre-text for repossession in violation of California Civil Code § 2983.3.

Galindo continued to act without justification when he foreclosed upon and resold the Sonata, and then sold the Focus, despite having received Whited's counsel's letter explaining to Galindo the legal problems with the repossession. Rather than rescind the transaction and return Mrs. Whited's vehicle once advised of the law, Galindo compounded the harm by selling both the Sonata and the Focus, despite Whited's counsel's demand for the latter's return. Even if Galindo had a plausible argument that he could retain one or both vehicles before his receipt of that letter, his foreclosure and resale of both vehicles after that was without "just cause or excuse." *See Jett v. Sicroff (In re Sicroff),* 401 F.3d 1101, 1107 (9th Cir.2005) (holding repeated libelous statements malicious when they went beyond the debtor's initial arguable justification).

The Court finds both the willful and malicious elements of § 523(a)(6) have been met.

## IV. DAMAGES

■ Having determined that Galindo's debt to Whited for statutory and common law fraud and conversion is not dischargeable, the Court must quantify it by reference to applicable state law. *Cohen v. de la Cruz,* 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (discharge exception under § 523(a)(2) applies to all liability arising on account of a debtor's fraudulent conduct, including treble damages and attorney's fees and costs under state law); *Fry v. Dinan (In re Dinan),* 448 B.R. 775, 782 (9th Cir. BAP 2011) (discharge exception "applies to all liability arising on account of a debtor's fraudulent conduct"); *Bertola v. N. Wis. Prod. Co. (In re Bertola),* 317 B.R. 95, 99–100 ( BAP 9th Cir. 2004) (attorney's fees included in non-dischargeability award when they were recoverable under state statute).

Whited's fraud damages recovery is one for actual damages under California Civil Code § 1770. *See Davis–Miller v. Auto. Club of S. Cal.,* 201 Cal.App.4th 106, 122–23, 134 Cal.Rptr.3d 551 (Cal.App.2d Dist. 2011) (Consumers Legal Remedies Act ("CLRA") permissible damages are actual and punitive damages). The Court will not award the resale value of the Focus because Whited's wife owned the Focus and she is not a party to this action. However, the Court awards Whited the trade-in value of the Focus, $1,500, which was its value provided to the transaction by Whited.

■ Whited cited the Song–Beverly Consumer Warranty Act ("SBCA") as a basis for recovery of double damages.[11]

---

11. California Civil Code § 1794(c) provides:
 "If the buyer establishes that the failure to comply was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages. This subdivision shall not

Whited failed to prove a violation of the SBCA, or fraud based on the Sonata's mechanical problems, since the problems did not deter the Whiteds from driving the car. A breach of the implied warranty of merchantability requires a showing that "the product did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App.4th 402, 408, 7 Cal.Rptr.3d 546 (Cal. App.4th Dist.2003).

 For Whited's conversion claim, California Civil Code § 3336 provides that the recovery for conversion is the fair market value of the property plus interest, in addition to fair compensation for time and money spent in pursuit of the property. *In re Guillory*, 285 B.R. at 315. Given that the Sonata was encumbered by the Contract, its fair market value to Whited was merely the difference between the lien and the value, or $1,500 here. To award Whited the value of the lien amount is not proper since Whited did not provide that value to the transaction. After Galindo wrongfully repossessed, he refused to provide an accounting to Whited. For this act, Automobile Sales Finance Act, California Civil Code § 2983.2 [12] requires the return of his profits from the repossession. This amount of $148.29 calculated by Whited by cancelling out the warranty contract which was never activated is added to Whited's total recovery.

Galindo must compensate Whited for his legal expenses due to the mandate of California Civil Code § 1780(e).[13] An award of attorney's fees, even if larger than Whit-

ed's personal loss, furthers the public goal of deterring unfair or deceptive business practices. *See Hayward v. Ventura Volvo*, 108 Cal.App.4th 509, 511–13, 133 Cal. Rptr.2d 514 (Cal.App.2d Dist.2003) (affirming a $98,000 attorney's fee award in auto dealer CLRA violation case where compensatory damages were $14,812). The fees awarded will be based on the lodestar method of calculation, based on time spent and hourly rate. *Graham v. Daimler-Chrysler Corp.*, 34 Cal.4th 553, 579, 21 Cal.Rptr.3d 331, 101 P.3d 140 (Cal.2004).

## V. CONCLUSION

Galindo's conduct in this case demonstrates a calculated attempt to profit at the expense of the Whiteds. For his tortious nondisclosure, misrepresentation, and conversion, he must return to Whited the $1,500 he wrongfully acquired from him. He also must return the $148.29 profit from his wrongful resale of the Sonata, and he must compensate Whited for his legal expenses. Whited is to file a declaration no later than **February 13, 2012** with the amount of his attorney's fees to be added to the judgment, to which Galindo may reply no later than **February 21, 2012**. A hearing will be held on the amount of attorney's fees and costs on **March 1, 2012 at 2:00 p.m.** in this Court.

---

apply ... with respect to a claim based solely on a breach of an implied warranty."

**12.** California Civil Code § 2983.2(c) provides: "In all sales which result in a surplus, the seller or holder shall furnish an accounting as provided in subdivision (b) whether or not requested by the buyer. Any surplus shall be

returned to the buyer within 45 days after the sale is conducted."

**13.** California Civil Code § 1780(e) provides that "[t]he court *shall* award court costs and attorney's fees to a prevailing plaintiff in litigation filed pursuant to this section." (Emphasis added).